## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SHAWN MILNER,
    *Plaintiff*,

    v.

NED LAMONT *et al.*,
    *Defendants*.

No. 3:20-cv-1245 (JAM)

### INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A

Plaintiff Shawn Milner is currently incarcerated in the Connecticut Department of Correction. He has filed a complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983. Milner challenges various aspects of his treatment in two prison facilities following his positive test result for COVID-19. The procedural history of this case is unusual in that I have previously ruled on numerous emergency and other motions for relief, appointed counsel for Milner (which counsel Milner has discharged), and convened status conferences with Milner, his counsel, and the Attorney General's Office in hopes of a resolution short of full-scale litigation of Milner's claims which he alleges against some 42 defendants in his amended complaint. These efforts not having proved successful, I now issue this initial review order to allow the complaint to be served on some of the named defendants in this action and for the litigation to proceed in the ordinary course.

### BACKGROUND

In his amended complaint, Milner names 42 defendants: Governor Ned Lamont, former Commissioner Rollin Cook, Commissioner Angel Quiros, Warden Martin, Nurse Yvonne Marceau, Nurse Hill, Lieutenant Atkinson, Lieutenant Schweighoffer, Cell Extraction Team Officers 1-6, Melissa Brown, Matt Eggen, Gerald Ganye, Warden Bowles, Nurse Heather Jane

Mcough, Ashley Brown, Lieutenant Thomas Titus, Lieutenant Milhaliak, Captain Anaya, Cell

Extraction Team Officers 7-12, Nurse Kristen Carabine, Pamela Jurewitz, Tim Bombard, Vicki

Scruggs, Michael Clements, Carson Wright, Lisa Mosier-Fryer, Captain Darren Chevalier,

Captain Brane Blackstock, Dr. Scott Muller, Edward Gonzalez, Nick Rodriguez, and Assistant

Attorney General Matthew B. Beizer. He contends that the defendants violated his rights under

the First, Eighth, and Fourteenth Amendments, rights afforded him under the Americans with

Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq*., and the Rehabilitation Act of 1973

("RA"), 29 U.S.C. § 794(a), as well as recommendations issued by the Centers for Disease

Control and Prevention ("CDC").[1]

Although documents attached to his complaint show that Milner is only 32 years old, he

states that he is in an age group at a significantly higher risk of severe disease and death if he

contracts COVID-19 and that he is medically vulnerable to the virus.[2] He describes himself as an

epileptic, COVID-19-positive, pretrial detainee.[3] Milner takes two medications for epilepsy:

Keppra and Dilantin.[4] As a result of the virus, Milner has lost his senses of smell and taste, and

has suffered complications such as seizures, convulsions, and changes in mental state.[5] Milner

was hospitalized for treatment of some of the complications.[6] He also suffers from swollen gums

and throat and an ulcer in his mouth.[7]

Although Milner states that he was confined at Northern Correctional Institution

---

[1] Doc. #5 at 10 (¶ 8).
[2] *See id.* at 3 (¶ 1), 76.
[3] *See id.* at 8 (¶ 7).
[4] *Id.* at 12 (¶ 10).
[5] *Ibid*.
[6] *Id*. at 11 (¶ 9).
[7] *Ibid*.

("Northern") "at all times relevant to this action," he also asserts claims relating to his confinement at Corrigan Correctional Center ("Corrigan").[8] He is presently incarcerated at MacDougall-Walker Correctional Institution ("MacDougall-Walker").

On June 11, 2020, Milner tested positive for COVID-19.[9] He was not officially quarantined in a COVID-19 quarantine unit.[10] Instead, per Warden Martin's orders, he was sent to a cell in the Corrigan admissions area and forced to sleep there on the insect-infested floor.[11] Milner's complaints that he was being bitten by bugs were ignored.[12] He was not afforded daily showers, telephone access, religious services, or recreational activities.[13] Although Corrigan had an infirmary, Milner was not permitted to go there.[14] No attempt was made to accommodate his seizure disorder.[15] He was not provided chloroquine, hydroxychloroquine, remdesivir, or any other COVID-19 treatment.[16]

While in the Corrigan admissions area, Milner reported to defendants Martin, Hill, Marceau, Brown, and Atkinson that he had begun to lose his senses of taste and smell and to experience "neurological complications."[17] Milner alleges that none of these defendants tried to help him or provided him with access to a doctor.[18] A few days later, Milner suffered a seizure

---

[8] *Id.* at 8 (¶ 7).
[9] *Id.* at 17 (¶ 14).
[10] *Ibid.* (¶ 15).
[11] *Ibid.*
[12] *Id.* at 23 (¶ 17).
[13] *Id.* at 17 (¶ 15).
[14] *Ibid.*
[15] *Ibid.*
[16] *Id.* at 15 (¶ 13).
[17] *Id.* at 21 (¶ 17).
[18] *Ibid.*

and was hospitalized for resulting injuries.[19] Upon his release from the hospital, Milner was not placed in a medical unit but was returned to the admitting area and locked inside.[20] The physician's discharge instructions were not followed.[21] Milner then suffered several other grand mal seizures, which were not reported or treated.[22] When Milner asked Nurse Marceau to re-bandage his fractured hand while she was distributing his anti-seizure medication, Marceau refused and slammed Milner's arm in the door.[23] Milner informed Lieutenant Atkinson of the incident but she did nothing to help and instead generated a false report to cover up the misconduct.[24]

When Milner requested medical care and examination by a doctor for COVID-19, he was threatened, "sprayed excessively" with a chemical agent, and beaten by several members of a cell extraction team under the supervision of Lieutenant Schweighoffer.[25] The officers continued to strike Milner after he was handcuffed.[26] When Milner requested medical attention for back, face, wrist, and eye injuries, the officers refused, and applied tight steel restraints that injured his wrists and ankles, then generated false reports to cover up their misconduct.[27]

Milner was sent to a COVID-19 unit at Northern, where he was denied state-mandated and CDC-mandated medical treatment, as well as daily showers, daily phone calls, recreation,

---

[19] *Ibid*.
[20] *Ibid*.
[21] *Ibid*.
[22] *Ibid*.
[23] *Id.* at 23 (¶ 17).
[24] *Ibid*.
[25] *Ibid*. (¶ 18).
[26] *Id*. at 25 (¶ 19).
[27] *Ibid*.

religious services, and access to the courts.[28] After going without recreation for over 22 days, Milner asked for mental health services.[29] He was threatened with removal from the quarantine unit if he continued to complain about medical care and conditions of confinement.[30] Milner responded that removal from the unit before the quarantine time expired would deprive him of mandated care and endanger the safety of other inmates and staff.[31] Shortly thereafter, officers again sprayed Milner with a chemical agent and assaulted him until he lost consciousness and began seizing, resulting in a second hospitalization.[32] Milner attaches documents showing that Lieutenant Titus supervised a group of officers that used a chemical agent on Milner at Northern on June 30, 2020, and that Nurse Carabine found contraindications for the use of a chemical agent based on a review of Milner's health record on July 1, 2020.[33]

## DISCUSSION

The Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A. In reviewing a *pro se* complaint, the Court must assume the truth of the allegations, and interpret them liberally to raise the strongest arguments they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010).

The Supreme Court has set forth a threshold "plausibility" pleading standard for courts to

---

[28] *Ibid*.
[29] *Ibid*.
[30] *Ibid*.
[31] *Ibid*.
[32] *Ibid*.
[33] *Id.* at 76 (medical incident report), 78 (incident report).

evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

Milner includes seven claims for relief, the last three of which are copied from a previously filed class action lawsuit in this District that resulted in a court-approved settlement agreement in July 2020.[34] The requests for declaratory, injunctive, and habeas relief are also copied from that class action.[35] In addition, Milner seeks class certification for this case to enable him to assert claims on behalf of other COVID-19-positive inmates housed at Northern.[36] Milner's claims are: (1) deliberate indifference to medical needs; (2) use of excessive force at both Corrigan and Northern; (3) denial of due process; (4) failure to follow CDC recommendations; (5) exclusion from services, programs and activities in violation of the ADA and RA; (6) unconstitutional punishment; and (7) unconstitutional conditions of confinement.

### *Class action*

Milner seeks leave to file this case as a class action to include all inmates confined in quarantine at Northern. Class certification is governed by Rule 23 of the Federal Rules of Civil

---

[34] *See McPherson v. Lamont*, No. 3:20-cv-534, Doc. #178. Following entry of the parties' settlement agreement, the Court instructed Milner to initiate a separate civil action if he wished to challenge his individual COVID-19 treatment in prison. *Id*., Doc. #206.
[35] Doc. #5 at 60-61 (¶¶ 2-6).
[36] *Id*. at 54-57 (¶¶ 78-87).

Procedure. Specifically, Rule 23(a) identifies four prerequisites which must be met before a class action can be certified.

> One or more members of a class may sue or be sued as representative parties on behalf of all only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

The party seeking to certify a class bears the burden of demonstrating that the requirements of Rule 23 have been met. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). As a *pro se* litigant, Milner can represent only himself. He cannot fairly and adequately protect the interests of a class of fellow prisoners. *See Nieblas-Love v. New York City Housing Auth.*, 165 F. Supp. 3d 51, 79–80 (S.D.N.Y. 2016). Because Milner cannot represent his purported class of inmates, the court need not address the remaining factors. The request for class certification is denied. The court considers the complaint as asserting Milner's claims only.

### *Personal involvement*

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). In the case caption, Milner lists thirty defendants by name and twelve collectively as extraction team officers. In the body of the complaint, however, he alleges only that he reported his COVID-19 symptoms to defendants Martin, Hill, Marceau, Melissa Brown, and Atkinson while he was at Corrigan; that defendant Marceau refused to change his bandage immediately on his request; that Lieutenant Schweighoffer supervised the response team at Corrigan; and that

7

Nurse Heather Jane Mcough ordered him removed from quarantine by force. Documents attached to the amended complaint further show that Lieutenant Titus supervised the response team at Northern and that Nurse Carabine conducted a review of Milner's health records prior to the use of chemical agents and found no contraindications, but that her subsequent report noted some known contraindications based on Milner's medical records.[37]

Milner alleges no facts showing that the following defendants were involved in his care or even aware of his specific issues: Governor Lamont, former Commissioner Cook, Commissioner Quiros, Nurse Carabine, Matt Eggen, Gerald Ganye, Ashley Brown, Lieutenant Milhaliak, Captain Anaya, Pamela Jurewitz, Tim Bombard, Vicki Scruggs, Michael Clements, Carson Wright, Lisa Mosier-Fryer, Captain Chevalier, Captain Blackstock, Dr. Muller, Edward Gonzalez, Nick Rodriguez, and Assistant Attorney General Beizer. Milner simply lists all these defendants in his description of the parties and states in conclusory fashion that they were "all made aware of the plaintiff's injuries, emergency COVID-19 medical needs not being provided to him, and all knew of, yet failed to provide care, or act in any way to assist the plaintiff with COVID-19 emergency medical care even though they all knew absent that treatment the Plaintiff will suffer fatality."[38]

Many of these defendants are supervisory officials. As with other correctional employees, Milner must show that the supervisor himself violated his constitutional rights. To state a plausible claim for relief against these individuals, Milner "must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the

---

[37] *Id*. at 76, 78.
[38] *Id*. at 10 (¶ 8).

8

Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). Namely, Milner must allege facts showing that each defendant, supervisor, or staff member was personally aware of his particular needs and disregarded the risk to him if those needs went unaddressed.  Milner has alleged no facts showing that he informed any of these defendants about his medical needs or indicating what each defendant did or did not do in response to that notice.

Milner also does not identify the facility where each defendant worked or even whether some of the defendants were custody officers or medical providers. The Department of Correction website indicates that defendant Bowles was the warden at Northern from 2019 until the facility was closed in June 2021. Thus, the Court will consider the conditions of confinement claims regarding Northern as they apply to Warden Bowles. As Milner alleges no facts suggesting that any of the other defendants were involved in his care, the claims against defendants Lamont, Cook, Quiros, Carabine, Eggen, Ganye, Ashley Brown, Milhaliak, Anaya, Jurewitz, Bombard, Scruggs, Clements, Wright, Mosier-Fryer, Chevalier, Blackstock, Muller, Gonzalez, Rodriguez, and Beizer are dismissed.

### *Deliberate indifference to medical needs*

Miller's first claim, for deliberate indifference to medical needs, is based on his placement in quarantine in the admissions area at Corrigan, denial of medical treatment while in quarantine, and defendant Marceau's refusal to re-bandage his hand. Milner asserts claims under both the Eighth and Fourteenth Amendments. However, he states, and the public records available on the Department of Correction website confirm, that he was unsentenced at the times relevant to the lawsuit. As a pretrial detainee rather than a sentenced inmate, Milner's claims are

9

cognizable under the Fourteenth Amendment, not the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). I will therefore consider Milner's conditions of confinement claim solely under the Fourteenth Amendment.

To state a claim for deliberate indifference to serious medical needs, a pretrial detainee must show that his medical need was "sufficiently serious*." See Spavone v. New York State Dep't of Corr. Servs.,* 719 F.3d 127, 138 (2d Cir. 2013). This inquiry "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). A sufficiently serious deprivation exists if the plaintiff suffers from an urgent medical condition that can cause death, degeneration, or extreme or chronic pain. *See Charles v. Orange Cty*., 925 F.3d 73, 86 (2d Cir. 2019). A medical condition may not initially be serious, but may become serious because it is degenerative and, if left untreated or neglected for a long period of time, could "result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000). The Second Circuit has identified several factors that are "highly relevant" to the question of whether a medical condition is sufficiently serious, including "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

Milner alleges that, as an epileptic suffering from COVID-19, he was particularly vulnerable to severe complications. Because this condition conceivably required medical treatment, altered Milner's daily activities, and caused him chronic pain, the Court assumes, for

10

purposes of initial review only, that Milner has shown a sufficiently serious medical need.

To state a deliberate indifference claim under the Fourteenth Amendment, Milner must also show that each defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to [him] even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Vega v. Semple*, 963 F.3d 259, 274 (2d Cir. 2020) (quoting *Darnell*, 849 F.3d at 35). Milner must therefore show that his condition resulted from a voluntary act or omission of culpable recklessness on the part of each defendant; mere negligence does not suffice. *See Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021).

Milner alleges that Warden Martin ordered that he be quarantined in the Corrigan admissions area rather than sending him to a COVID-19 unit.[39] He says that he reported his COVID-19 symptoms to Warden Martin, Lieutenant Atkinson, and nurses Hill, Marceau, and Brown, but that he was denied medical treatment and as a result suffered several severe seizures, one of which required his hospitalization.[40] I will address this claim first with respect to Warden Martin and Lieutenant Atkinson and then with respect to nurses Hill, Marceau, and Brown.

Milner has not pleaded facts plausibly supporting the inference that Warden Martin and Lieutenant Atkinson acted intentionally to prevent him from receiving necessary medical treatment for COVID-19 or related seizures. Milner argues that his placement in the admissions area was "unrelated to any legitimate penological interest."[41] But as Milner himself later told

---

[39] *Id*. at 19 (¶ 16).
[40] *Id*. at 21 (¶ 17).
[41] *Id*. at 21 (¶ 16).

11

prison officials at Northern, releasing him from quarantine would have put other inmates and prison staff at risk of contracting COVID-19.[42] Because Warden Martin had a facially valid purpose for placing Milner in a makeshift quarantine and Milner has adduced no evidence showing a contrary purpose on their part, Milner has not plausibly alleged that Martin or Atkinson acted with intent to deprive him of medical treatment by requiring him to stay in the admissions area.

Nor has Milner plausibly alleged that Martin or Atkinson recklessly failed to act with reasonable care to mitigate the risk that Milner would suffer a seizure or other substantial harm in quarantine. First, Milner does not allege that he told defendants he was at risk for COVID-related seizures or that defendants were otherwise informed of that risk. Milner's allegation that he told defendants he was experiencing loss of taste and smell and "neurological complications" does not suffice to show that defendants were specifically aware that Milner was at risk of having a seizure as opposed to more general COVID-19 symptoms. Milner has not alleged that defendants denied him access to a doctor or medication despite being informed that he needed such treatment to prevent a seizure or any other kind of substantial harm.

In fact, Milner does not allege that he was deprived of his anti-seizure medication at all; he admits medical staff continued to administer that medication to him.[43] Instead, Milner pleads in conclusory terms that "no defendant attempted to help him in any way or even allow him to

---

[42] *Id*. at 25 (¶ 19).

[43] Doc. #5 at 23 (¶ 17). This is in contrast to Milner's deliberate indifference claim in a previous action, which I allowed to proceed based on Milner's allegation that "he informed all of the defendants, either verbally or in writing, that he was not receiving all of his medication or the proper dosage of medication, and that he was experiencing severe head and back pain and could experience seizures without proper medication" but "[d]espite this information, no defendant would take action to ensure that he received proper treatment." *Milner v. Laplante*, 2019 WL 79428, at *3 (D. Conn. 2019).

see a doctor at all."[44] This does not suffice to show defendants' involvement or reckless disregard of a substantial risk of serious harm. *Compare Vega*, 963 F.3d at 274 (officials disregarded known and substantial risk that unabated indoor radon exposure posed to inmates), *with Crawford v. Tilley*, 15 F.4th 752, 761–62 (6th Cir. 2021) (dismissing deliberate indifference claim against commissioner who ordered inmate's transfer to another location for failure to allege facts showing the commissioner "implicitly authorized, approved, encouraged, or knowingly acquiesced in the alleged violation" that took place after the transfer).

With respect to Milner's claim that officials returned him to the locked admissions unit and disregarded the doctor's discharge instructions after his hospitalization for the first seizure, he fails to specify which defendants made this decision or whether any of the defendants (1) were aware that the reason for his prior hospitalization was a seizure as opposed to other COVID-19 complications or (2) were informed of the doctor's discharge instructions. If Martin or Atkinson ordered Milner to be returned to quarantine and denied him appropriate medical treatment notwithstanding his previous seizure and contrary discharge instructions, that might plausibly show that they acted with reckless indifference to the fact that Milner might continue to suffer seizures despite taking his anti-seizure medication. But absent allegations that Martin or Atkinson was aware of the reason for Milner's previous hospitalization and the physician's instructions upon his discharge, Milner fails to state a deliberate indifference claim against Martin or Atkinson. The claim is dismissed without prejudice to Milner amending his complaint to correct this deficiency if Milner has a good faith basis to do so.

---

[44] Doc. #5 at 21 (¶ 17).

Milner identifies defendants Marceau and Hill as nurses, and the Court will assume from context that Melissa Brown is also a nurse. Milner alleges that these defendants provided him with no treatment other than his anti-seizure medication after he reported his symptoms to them. With respect to the period prior to his first hospitalization, Milner has not alleged sufficient facts to plausibly suggest that Marceau, Hill, or Brown recklessly disregarded a substantial risk that Milner would suffer a COVID-related seizure, given that they were administering an anti-seizure medication to him during that period. But Milner's claim that, after he returned from the hospital, defendants ignored his discharge instructions and did nothing to treat his continuing seizures, while sparsely stated, suffices to plausibly show that the nurses at Corrigan were deliberately indifferent to his sufficiently serious medical needs. The Court will allow that claim to proceed against these three defendants.

Milner also alleges that Nurse Marceau refused to re-bandage his broken hand while she was administering his anti-seizure medication. To the extent that this is a separate claim for deliberate indifference to medical needs, the claim fails. Milner's fracture had already been treated. His request was for Nurse Marceau to rebandage his hand, and he alleges that Nurse Marceau refused this request while administering his medication. Where, as here, the claim is for a delay in treatment, the court focuses on the effect of the delay, not the underlying injuries, when determining if there is a serious medical need under the objective component of the deliberate indifference test. *See Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003). Milner alleges no facts suggesting that his injury was exacerbated by the failure to change his bandage or that Nurse Marceau was aware that denying the request would lead to a severe worsening of his condition. As such, Milner fails to state a claim for deliberate indifference to medical needs

14

against Nurse Marceau for refusing to rebandage his hand. *See Lombardo v. Graham*, 807 F. App'x 120, 124 (2d Cir. 2020). This deliberate indifference claim against defendant Marceau is dismissed. Milner's allegation that defendant Marceau slammed his arm in the door will be considered below with his other excessive force claims.

Finally, Milner alleges that he received no treatment for the possible ulcer in his mouth. But he identifies no defendant who failed to treat him for this condition. Thus, the Court does not consider this claim.

### *Excessive force*

Milner alleges that officers supervised by Lieutenant Schweighoffer used excessive force against him at Corrigan and that officers supervised by Lieutenant Titus used excessive force against him at Northern.

To state a claim for the use of excessive force, a pretrial detainee must "show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). A plaintiff may prevail by showing that actions taken against him "are not rationally related to a legitimate nonpunitive governmental purpose," or "appear excessive in relation to that purpose." *Ibid*. Officers are liable not only when they use excessive force themselves, but also when they fail to intervene to stop the excessive use of force by another officer when in a position to observe the conduct and with time to intervene. *See Sloley v. VanBramer*, 945 F.3d 30, 46–47 (2d Cir. 2019).

Milner alleges that, at both Corrigan and Northern, he was beaten and sprayed with a chemical agent in response to his requests for medical or mental health treatment and his complaints about the care he was receiving for COVID-19. The allegations do not suggest that

15

officers were responding to a security problem or that Milner posed a threat to anyone else when he was assaulted. Instead, the allegations suggest that officers used force to discourage Milner's complaints about the care he was receiving and continued to strike and beat him even after he was handcuffed and not providing any resistance.

 In the absence of any facts showing a legitimate purpose for these uses of force, the Court will allow Milner's use of excessive force claim to proceed against Lieutenants Schweighoffer and Titus. The excessive force claims cannot proceed against the defendants identified only as Cell Extraction Team Officers 1-6 and 7-12 until Milner identifies these officers. If he learns their names, he may file a motion to supplement the complaint and amend the case caption.

As part of his claim for deliberate indifference to serious medical needs, Milner alleges that Nurse Marceau "slammed [his] arm in [the cell] door."[45] This allegation, liberally construed, supports the inference that Nurse Marceau acted intentionally and without a basis for the use of such force. Although Milner does not describe his resulting injury, the Court will permit an excessive force claim to proceed against Nurse Marceau for further development of the record.

### *Retaliation*

Although Milner does not include a claim for retaliation, he does include a reference to the First Amendment, and he expressly alleges that force was used against him in response to his complaints seeking medical care.[46] Thus, the Court will determine whether Milner's allegations support a retaliation claim.

---

[45] *Id*. at 23 (¶ 17).
[46] *Id*. at 10 (¶ 8).

16

To state a cognizable First Amendment retaliation claim, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018) (quoting *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2001). The adverse action must have been sufficiently serious that it would deter a similarly situated person of ordinary firmness from exercising his right to speak. *See id.* at 93–94. "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Zaire v. Coryer*, 204 F. App'x 948 (2d Cir. 2006) (quoting *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001)).

The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation— can be characterized as a constitutionally proscribed retaliatory act." *Dolan*, 794 F.3d at 295. For this reason, a prisoner's retaliation claim must "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Ibid.*

Cases asserting retaliation claims for inmate speech generally concern complaints made to prison officials regarding the conduct of correctional officers or prison conditions. *See Riddick v. Arnone*, 2012 WL 2716355, at *7 (D. Conn. 2012). "Although some district courts have found that verbal complaints may be protected for the purposes of a First Amendment retaliation claim, the Second Circuit has yet to articulate a bright line rule regarding constitutionally protected oral speech by an inmate." *Cosby v. McDonald*, 2020 WL 5026550, at *6 (D. Conn. 2020). Even those courts allowing a retaliation claim based on oral inmate speech distinguish between verbal

17

grievances, which are considered protected speech, and verbal confrontations or arguments, which are not. *Id.*

Regarding the incident at Corrigan, Milner alleges that force was used in direct response to his requests for medical care and examination by a doctor.[47] District courts in this Circuit are divided on whether an inmate's request for medical attention falls within the First Amendment's protections. *Compare Crispin v. Haber*, 2020 WL 6136209, at *4 (D. Conn. 2020) (assuming such speech is protected but finding no retaliation), *with Gilmore v. Blair*, 2020 WL 5792467, at *5 (N.D.N.Y. 2020) ("Courts have not recognized a freestanding right to request medical attention as a protected activity sufficient to support a retaliation claim."), *report and recommendation adopted,* 2020 WL 5775203 (N.D.N.Y. 2020), *appeal dismissed,* 2021 WL 4721022 (2d Cir. 2021). "[W]hen faced with such a claim, district courts in the Second Circuit frequently assume, but do not decide, that requests for medical attention are protected by the First Amendment for the purpose of analyzing the merits of a retaliation claim." *James v. Gage*, 2019 WL 6251364, at *6 (S.D.N.Y. 2019) (collecting cases).

Here, I must directly confront the question of whether a prisoner's request for medical attention is protected speech, because Milner has alleged that his request for medical attention was the sole cause of the officers' violent response. Because I need not consider at this stage whether the law was clearly established for purposes of qualified immunity, I am tasked simply with answering whether the Constitution protects an inmate's requests for medical care. I agree with those courts that have found such speech protected under the First Amendment. *See, e.g.*

---

[47] *Id.* at 23 (¶ 18).

*Maxwell v. City of New York*, 272 F. Supp. 2d 285, 300 (S.D.N.Y. 2003) ("[G]iven a prisoner's established constitutional right to emergency medical attention under the Eighth Amendment, such a request will be deemed by the Court to be protected by the First Amendment from retaliation by prison guards."), *aff'd in relevant part,* 380 F.3d 106 (2d Cir. 2004), *supplemented,* 108 F. App'x 10 (2d Cir. 2004); *Williams v. Turner,* 2022 WL 1692514, at *5 (E.D. Wis. 2022) ("If a prisoner were disciplined solely because of his requests for proper medical treatment, it would surely be a constitutional violation.") (quoting *West v. McCaughtry,* 971 F. Supp. 1272, 1277 (E.D. Wis. 1997)). The retaliation claim will therefore proceed against Lieutenant Schweighoffer, the only identified defendant involved in the Corrigan incident.

Although Milner makes a similar claim regarding the officers' use of force against him at Northern, that force was not used until after he argued with the officers that they could not remove him from quarantine. This intervening speech is a verbal confrontation or argument that is not considered protected speech. *See Cosby*, 2020 WL 5026550, at *7 (dismissing retaliation claim because inmate's "verbal argument with CTU Officer McDonald in connection with his request for a new pair of boxer shorts and an undershirt" did not constitute exercise of protected speech). Thus, Milner fails to state a cognizable First Amendment retaliation claim regarding the use of force at Northern.

### *Conditions of confinement*

Milner challenges the conditions of his confinement. The Court considers this challenge to be the basis for Milner's causes of action asserting Fourteenth Amendment claims based on conditions of confinement and punishment.

In the amended complaint, Milner includes many allegations from the previously settled

class action complaint. As those allegations vary among correctional facilities without identifying the facilities, the Court cannot tell which conditions apply to Milner. For review of this claim, therefore, the Court considers only the allegations that Milner was personally subjected to, namely, sleeping on a bug-infested floor at Corrigan and denial of showers, phone use, recreation, and religious services at both Corrigan and Northern. Milner also alleges generally that he was never given cleaning supplies to clean his cells.[48]

"A pretrial detainee may not be punished at all under the Fourteenth Amendment, whether … by deliberate indifference to conditions of confinement, or otherwise." *Darnell*, 849 F.3d at 35. To bring a deliberate indifference to conditions of confinement claim under the Due Process Clause, a pretrial detainee must allege "that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process" and that "the officer acted with at least deliberate indifference to the challenged conditions." *Valdiviezo v. Boyer*, 752 F. App'x 29, 32 (2d Cir. 2018). Milner must show that, in light of contemporary standards of decency, the severity and duration of the challenged conditions, taken together, posed an unreasonable risk of serious damage to his health, even absent any resulting injury. *See Darnell*, 849 F.3d at 30.

With respect to the duration of the challenged conditions, Milner does not indicate how long he was confined at each facility. He alleges that he tested positive for COVID-19 on June 11, 2020, and submits a medical incident report showing that he was at Northern on June 30, 2020.[49] Thus, he has alleged that he was in the cell in the admissions area at Corrigan for, at

---

[48] *Id*. at 51 (¶¶ 67, 69).
[49] *Id*. at 17 (¶ 14), 76 (medical incident report).

20

most, nineteen days, including an unspecified period of time during which he was hospitalized following a seizure.[50] Milner was at Northern when he filed this action on August 25, 2020.[51] Thus, he was at Northern for at least fifty-seven days.

*Bugs in cell*

Milner alleges that there were bugs in the admissions area at Corrigan that bit him while he slept on the floor on a daily basis. He was confined there from June 11, 2020, until he was transferred to Northern, a period of at least two weeks. These allegations are sufficient to permit a conditions of confinement claim to proceed. *See Vail v. City of New York*, 2020 WL 3548074, at *7 (S.D.N.Y. 2020) ("The mere presence of vermin in a detainee's housing area does not constitute a denial of the minimal civilized measure of life's necessities. Where, however, exposure to vermin resulted in an injury to the plaintiff, courts have found objective deprivations."), *report and recommendation adopted*, 2020 WL 3547736 (S.D.N.Y. 2020); *Cano v. City of New York*, 119 F. Supp. 3d 65, 77–78 (E.D.N.Y. 2015) (finding no unconstitutional conditions of confinement where pretrial detainees who alleged that they saw vermin in their cells were confined there for at most twenty-four hours at a time and did not present evidence that they suffered any ill effects), *aff'd in relevant part sub nom. Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017).[52] However, Milner does not allege which defendants he informed about the

---

[50] Milner further alleges that he was denied indoor and outdoor recreation for at least 22 days. *Id*. at 25 (¶ 19). In light of the above timeline the Court understands Milner to be alleging that he was denied recreation opportunities from around the time of his positive COVID-19 test on June 11 at Corrigan through the end of the month at Northern.

[51] *Id*. at 8 (¶ 7).

[52] Similarly, in *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008), the Seventh Circuit acknowledged that "a prolonged pest infestation … may be considered a deprivation sufficient to constitute a due process violation" but found none where prisoner alleged he was bitten only twice by cockroaches during a six-year confinement.

infestation. Absent allegations that any particular defendant was aware of the issue, he fails to state a claim based on this condition of confinement. *See Barnes v. Malavi,* 412 F. Supp. 3d 140, 144 (E.D.N.Y. 2019). The claim is dismissed without prejudice to Milner amending his complaint to correct this deficiency.

### *Conditions of quarantine*

Milner alleges that as a result of his positive COVID-19 test, he was denied access to showers, telephone calls, recreational activities, and religious services at both Corrigan and Northern.[53] As a pretrial detainee, Milner was subjected to these conditions from at least June 11, 2020, until August 25, 2020, the day he filed his complaint in this action.

Inmates have a right to sanitary living conditions and necessary materials to maintain personal hygiene. *See Walker v. Schult*, 717 F.3d 119, 127 (2d Cir. 2013). Exercise is also a basic human need. *See Wilson v. Seiter*, 501 U.S. 294, 304–05 (1991). "Although deprivations of physical exercise for short periods will not rise to constitutional dimension … claims for periods far shorter than [] four months … have been held viable." *McCray v. Lee*, 963 F.3d 110, 117–18 (2d Cir. 2020). Nonetheless, the Second Circuit has held that prison officials may limit out-of-cell exercise where there is a valid "safety exception" or other "unusual circumstances," such as when "providing [a particular inmate] with an opportunity for exercise would have posed an immediate danger of contagion." *Williams v. Greifinger*, 97 F.3d 699, 704–06 (2d Cir. 1996).

Milner alleges that he was denied the opportunity to shower and exercise outside his cell after testing positive for COVID-19. But Milner himself demanded that he be placed in a

---

[53] *Id*. at 17-19 (¶¶ 15-16).

separate unit to receive appropriate care and to prevent spreading COVID-19 to other prisoners or staff. Under such quarantine circumstances, Milner has not plausibly alleged that the denial of his recreation and shower privileges was unwarranted. *See Pape v. Cook*, 2021 WL 2186427, at *10 (D. Conn. 2021) ("[G]iven the existence of the restriction on out of cell exercise during Mr. Pape's period of confinement because of his exposure to his cellmate, who had exhibited symptoms of having contracted COVID-19, Mr. Pape has not plausibly alleged a constitutional violation."); *Herbert v. Smith*, 2021 WL 3292263, at *6 (S.D.N.Y. 2021) ("[A]lthough Plaintiff does not specify why he was denied recreation periods, the timing of the alleged denials … indicates that Plaintiff was denied recreation periods not because of Defendants' deliberate indifference; but rather, as a result of health and safety restrictions implemented at [his facility] to prevent the COVID-19 virus's spread among the inmate population—a sufficiently 'unusual circumstance' to justify such a denial."); *Carolina v. Feder*, 2021 WL 268854, at *8 (D. Conn. 2021) (lack of access to shower, hand soap, cell cleaning materials, and clean clothes and bedding for two-week quarantine period not of constitutional dimension).

As for Milner's alleged inability to place telephone calls, "restrictions on telephone usage do not infringe on inmates' First Amendment rights if alternate means of communicating with others outside of prison are available." *Pape*, 2021 WL 2186427, at *6. Milner has not alleged that either facility interrupted his right to the free flow of incoming and outgoing mail or prevented him from communicating with counsel or others for legal purposes. He has therefore failed to state a claim based on denial of telephone access.

Finally, with respect to the denial of religious services, there is no question that inmates are entitled to reasonable accommodation from substantial burdens on their religious beliefs. *See*

*Holt v. Hobbs*, 574 U.S. 352, 369–70 (2015). But Milner alleges only that he was told he could not come out of quarantine for any matter including attending religious services. To state a constitutional or statutory free exercise claim, a prisoner must allege that he invoked the right to exercise his religion by requesting certain religious items or services and then being denied the same. *See Porter v. Bunch*, 2019 WL 1428431, *16 (S.D.N.Y. 2019). Because Milner did not allege making such a request, he has failed to state a claim respecting the denial of religious services.

Milner's unconstitutional conditions of confinement claims against Wardens Martin and Bowles related to the conditions of his quarantine are dismissed without prejudice to Milner amending his complaint to correct the above deficiencies.

### *Denial of due process*

Milner contends that he was placed in administrative segregation at Northern without a hearing or a guilty finding on any disciplinary charge. Milner argues that the conditions of his administrative segregation at Northern were more restrictive that those applied to inmates in restrictive housing at Corrigan, because restrictive housing inmates receive showers, phone calls, recreation, and religious services while he did not. Milner alleges that Northern housed the COVID-19 quarantine units and that he was sent there for quarantine. The Court considers any challenge to the conditions of confinement in quarantine to be a restatement of the claims addressed above.

Procedural due process requires that the government act "in a fair manner." *United States v. Salerno*, 481 U.S. 739, 746 (1987). To state a claim for violation of his right to procedural due process, Milner must allege facts showing that he had a protected liberty interest and that he was

deprived of that interest without being afforded due process of law. *See Ruggiero v. Fischer*, 807 F. App'x 70, 73 (2d Cir. 2020) (citing *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001)). The Due Process Clause, standing alone, generally does not create a protected liberty interest in conditions of confinement as long as the conditions are "within the normal limits or range of custody which the conviction has authorized the State to impose." *Meachum v. Fano*, 427 U.S. 215, 225 (1976).

Milner alleges that he was placed in quarantine after testing positive for COVID-19. No court has held that a hearing is required before an inmate is placed in medical quarantine. *See Pape*, 2021 WL 2186427, at *12 (dismissing procedural due process challenge to confinement in quarantine for fifteen days without a hearing by sentenced inmate). Milner's procedural due process claim is therefore dismissed.

### *CDC recommendations*

Milner asks the Court to order the defendants to comply with guidelines from the Centers for Disease Control ("CDC") and the requirements of the Americans with Disabilities Act and the Rehabilitation Act.

Inmates do not have a constitutional right to enforce prison officials' compliance with CDC guidelines. In *Valentine v. Collier*, 978 F.3d 154 (5th Cir.), *cert. denied*, 141 S. Ct. 57 (2020), the Fifth Circuit considered a claim that the prison officials' failure to implement CDC recommendations regarding COVID-19 was cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. The court held that the mere failure to comply with CDC guidelines does not rise to the level of a constitutional violation. *Id.* at 164. Without more, the fact that a prison official departs from CDC recommendations does not give inmates a basis to

sue under the Constitution. Accordingly, this claim is dismissed.

### ADA and RA Claims

Milner contends that the defendants have violated the ADA and RA by discriminating against him because of his disability. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 121342. Similarly, "the Rehabilitation Act requires specified 'otherwise qualified' disabled individuals receive reasonable accommodations from programs receiving federal financial assistance." *Quezada v. Fischer*, 2017 WL 9509993, at *34 (N.D.N.Y. 2017). Because the standards under both statutes are the same, courts treat claims under the ADA and RA identically. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).[54]

To state a cognizable disability claim, Milner must establish three factors: (1) he is a qualified person with a disability, (2) the defendants in their individual or official capacities are considered entities subject to the ADA, and (3) he was denied the opportunity to participate in or benefit from an institutional program, service, or activity, or otherwise discriminated against because of his disabilities. *See Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). The Court need not decide whether Milner's COVID-related condition qualifies as a disability under the ADA or whether the defendants are entities subject to the ADA because

---

[54] The primary difference between the ADA and RA is that the RA applies to entities receiving federal financial assistance, while Title II of the ADA applies to all public entities, a distinction not relevant here. *See Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 320 n.13 (D. Conn. 2008).

Milner's allegations make clear that the restrictions he challenges were implemented after he tested positive for COVID-19 for the express purpose of quarantining him and thereby protecting others from catching a highly contagious virus.

"A plaintiff may base her claim under Title II of the ADA on any of three theories of liability: disparate treatment (intentional discrimination), disparate impact, or failure to make a reasonable accommodation." *Tardif v. City of New York*, 991 F.3d 394, 404 (2d Cir. 2021). Milner advances all three theories.[55] He describes himself as a "COVID-19 epileptic" and alleges that he was denied and excluded from recreational activities and shower and phone services because of his disability.[56]

Intentional discrimination "may be inferred when a qualifying official or policymaker … has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Biondo v. Kaledia Health*, 935 F.3d 68, 73 (2d Cir. 2019) (cleaned up), *cert. denied sub nom. Kaleida Health v. Biondo*, 140 S. Ct. 956 (2020). But restrictions imposed to protect other prisoners from infection do not constitute discrimination on the basis of a contagious prisoner's disability under the ADA. *See Harper v. Cuomo*, 2021 WL 1540483, at *5 (N.D.N.Y. 2021). Here, there is no allegation that the challenged restrictions were imposed on Milner to penalize him for his disability. Instead, Milner was subject to these restrictions in an attempt to control the spread of COVID-19 after he tested positive for the virus.

"The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." *Tsombanidis v. W.*

---

[55] Doc. #5 at 31 (¶ 23).
[56] *Id*. at 29 (¶ 23).

*Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003). To state a claim for disparate impact,

Milner must allege sufficient facts to plausibly show "(1) the occurrence of certain outwardly

neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a

particular type produced by the defendant's facially neutral acts or practices." *Schoengood v.*

*Hofgur LLC*, 2021 WL 1906501, at \*3 (E.D.N.Y. 2021). Milner does not allege a facial or

outwardly neutral policy; rather, he alleges targeted conduct directed specifically at him. He

claims that he is "**the only** COVID-19 Connecticut State citizen to be subject to being assaulted

and battered excessively, denied proper quarantine, denied medical care, denied COVID daily

showers calls and religious services as well as mental health care while 'quarantining' ami[d]st

the current ongoing COVID-19 pandemic crisis."[57] As such, Milner fails to state a claim for

disparate impact under the ADA. *See Attard v. City of New York*, 451 F. App'x 21, 24 (2d Cir.

2011) ("Because Attard failed to identify a facially neutral practice, she cannot establish a *prima*

*facie* case of disparate impact.").

      The ADA also requires covered entities to provide "reasonable accommodations" to

individuals with disabilities. *See* 42 U.S.C. § 12182(b)(2)(a)(ii). The Second Circuit has

explained that "a reasonable accommodation need not be perfect or the one most strongly

preferred by the plaintiff, but it still must be effective." *Gibbs v. Doe 1-7*, 2020 WL 7129584, at

\*9 (D. Conn. 2020) (quoting *Wright*, 831 F.3d at 72). "In examining a reasonable

accommodation claim, we ask whether a plaintiff with disabilities as a practical matter was

denied meaningful access to services, programs or activities to which he or she was legally

---

[57] *Id*. at 25-27 (¶ 19) (emphasis in original).

entitled." *Ibid.*

Milner fails to state a failure-to-accommodate claim based on either alleged inadequacies in his medical quarantine or his exclusion from general prison programming.[58] With respect to medical care, the fact that a pretrial detainee's disability motivates him to seek out specific medical services does not transform the alleged inadequacy of those services into an ADA claim. *See Tardif*, 991 F.3d at 405; *Cunningham v. Lupis*, 2021 WL 4593942, at *18 (D. Conn. 2021). Nor, as explained above, has Milner plausibly alleged that his *disability*—as opposed to the risk that he would infect other prisoners or staff with COVID-19—was the reason he was excluded from other services, programs, and activities. Thus, Milner fails to state a cognizable ADA or RA claim.[59]

### Nurse Mcough

Milner alleges that Nurse Mcough ordered him removed from quarantine before the end of his quarantine period. He does not include Nurse Mcough in his claim for deliberate indifference to medical needs, nor does he does not provide any facts to support a claim for deliberate indifference to medical needs against her.[60] For example, Milner does not indicate whether this removal occurred at Corrigan or Northern, the reason for his removal, whether he was exhibiting symptoms of COVID-19 at the time, or how long he had been in quarantine. The Court notes that Milner alleges that he tested positive on June 10, 2020, and submitted a notice

---

[58] *Id.* at 29 (¶ 23).

[59] Instead, the appropriate vehicle for this claim is a due process challenge for denial of appropriate medical treatment under a deliberate indifference standard, as already addressed above. *See Tardif*, 991 F.3d at 405 n.9.

[60] Doc. #5 at 49 (¶¶ 61-62), 53 (¶ 74).

indicating that the quarantine period, presumably his, ended on August 21, 2020.[61] Absent

supporting facts, Milner fails to show that Nurse Mcough understood that her actions posed a

significant risk to Milner's health. The claim against Mcough is dismissed with leave to amend if

Milner can allege facts to support a cognizable claim.

### Habeas corpus relief

Milner copied his request for habeas relief from the class action, claiming he was

especially vulnerable to severe illness and death from COVID-19 and seeking immediate release

to avoid contracting the virus.[62] However, at the time he filed this action, Milner had already

contracted the virus. Thus, his request for immediate release to avoid contracting the virus is

denied as moot.

### Declaratory and injunctive relief

Milner states that he seeks declaratory and injunctive relief, damages, and prosecution of

"all criminally liable defendants."[63]

Declaratory relief serves to "settle legal rights and remove uncertainty and insecurity

from legal relationships without awaiting a violation of the rights or a disturbance of the

relationship." *Colabella v. American Inst. of Certified Pub. Accountants*, 2011 WL 4532132, at

*22 (E.D.N.Y. 2011). As such, "[d]eclaratory relief operates prospectively to enable parties to

adjudicate claims before either side suffers great damages." *Orr v. Waterbury Police Dep't*, 2018

WL 780218, at *7 (D. Conn. 2018). Because Milner asks the Court to declare only that the

---

[61] *Id*. at 77.
[62] *Id*.  at 3, 5 (¶¶ 1, 3).
[63] *Id*. at 12 (¶ 10).

defendants' "past actions" violated his constitutional rights, the request for declaratory relief is dismissed. *Ibid*.

Milner's requests for injunctive relief are copied from the class action. They seek release of medically vulnerable inmates to prevent them from contracting COVID-19. As Milner alleges that he already contracted the virus, his requests are dismissed as moot.

Finally, Milner seeks criminal prosecution of the defendants. But "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Brady v. Berman*, 837 F. App'x 70, 71 (2d Cir. 2021) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Milner's request to have the defendants criminally prosecuted is therefore denied.

CONCLUSION

The Court DENIES Milner's request for class certification, his requests for habeas corpus, declaratory, and injunctive relief, and the request to have the defendants criminally prosecuted.

The Court DISMISSES the following claims without prejudice pursuant to 28 U.S.C. § 1915A(b)(1): all Eighth Amendment claims, all claims against defendants Lamont, Cook, Quiros, Carabine, Eggen, Ganye, Ashley Brown, Milhaliak, Anaya, Jurewitz, Bombard, Scruggs, Clements, Wright, Mosier-Fryer, Chevalier, Blackstock, Muller, Gonzalez, Rodriguez, and Beizer; the deliberate indifference to medical needs claim against defendant Marceau for failure to re-bandage Milner's hand; the retaliation claim regarding the incident at Northern; the procedural due process claim; the claim for failure to comply with CDC guidelines; and the ADA and RA claims.

The Court DISMISSES the following claims without prejudice to filing an amended

complaint if Milner can allege additional supporting facts as described above: the deliberate indifference to medical needs claims against defendants Martin and Atkinson for failure to treat COVID-19 symptoms; the conditions of confinement claim based on the presence of bugs in the cell at Corrigan; the conditions of confinement claim related to the denial of services during quarantine; and the claim against Nurse Mcough for removing Milner from quarantine. If Milner wishes his excessive force claims to proceed against the defendants identified only as Cell Extraction Team Officers 1-6 and 7-12, he must promptly file a supplemental complaint providing their names to the Court.

Any amended complaint to correct the identified deficiencies in these claims shall also be filed on or before **July 8, 2022**. Failure to do so will result in the dismissal of the claims with prejudice.

Absent amendment to the complaint, the case will proceed on the following claims against the defendants identified for each claim in their individual capacities: (1) the claim for deliberate indifferent to medical needs against nurses Marceau, Hill, and Melissa Brown for ignoring discharge instructions and doing nothing to treat continuing seizures; (2) the use of excessive force claims against Lieutenant Schweighoffer, Lieutenant Titus, and Nurse Marceau; and (3) the retaliation claim against defendant Schweighoffer regarding the incident at Corrigan.

The Court enters the following orders:

(1)      **The Clerk shall** verify the current work address for defendants Marceau, Hill, Melissa Brown, Schweighoffer, and Titus with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet containing the Complaint and this Order to each defendant at the address provided within **twenty-one (21) days** of this Order, and

report to the court on the status of the waiver request on the thirty-fifth day after mailing.  If any

defendant fails to return the waiver request, the Clerk shall make arrangements for in-person

service by the U.S. Marshals Service on the defendant in his or her individual capacity and the

defendant shall be required to pay the cost of such service.

(2)     The defendants shall file their response to the complaint, either an answer or

motion to dismiss, within **thirty (30) days** from the date the waiver forms are sent. If they

choose to file an answer, they shall admit or deny the allegations and respond to the cognizable

claim recited above. They also may include all additional defenses permitted by the Federal

Rules.

(3)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be

completed within **five months (150 days)** from the date of this order. Discovery requests need

not be filed with the court.

(4)     All motions for summary judgment shall be filed within **six months (180 days)**

from the date of this order.

(5)     Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a

dispositive motion within twenty-one (21) days of the date the motion was filed.  If no response

is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(6)     If the plaintiff changes his address at any time during the litigation of this case,

Local Court Rule 83.1(c)(2) provides that he MUST notify the court.  Failure to do so can result

in the dismissal of the case.  The plaintiff must give notice of a new address even if he is

incarcerated.  The plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice.  It

is not enough to just put the new address on a letter without indicating that it is a new address.  If

33

the plaintiff has more than one pending case, he should indicate all the case numbers in the notification of change of address.  The plaintiff should also notify the defendants or the attorney for the defendants of his new address.

(7)     The plaintiff shall utilize the Prisoner Efiling Program when filing documents with the court.  The plaintiff is advised that the Program may be used only to file documents with the court. As local court rules provide that discovery requests are not filed with the court, discovery requests must be served on defendants' counsel by regular mail.

(8)     The Clerk shall immediately enter the District of Connecticut Standing Order Re: Initial Discovery Disclosures concerning cases initiated by self-represented inmates and shall send a copy to the plaintiff.

It is so ordered.

Dated at New Haven this 9th day of June 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

34